## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**WAYNE DOUGLAS WESTON**                          **CIVIL ACTION**

**VERSUS**                                                          **NO. 10-0334**

**BURL CAIN, WARDEN**                                 **SECTION "R" (6)**

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).  Accordingly, it is **HEREBY RECOMMENDED** that the instant petition for federal habeas corpus relief  be **DENIED WITH PREJUDICE.**

# I.  PROCEDURAL HISTORY[1]

In February, 2001, petitioner, Wayne Douglas Weston, a state prisoner presently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana, was charged via bill of information with attempted second degree murder.[2]  Petitioner pled not guilty and was tried before a jury in the Thirty-Second Judicial District Court for the Parish of Terrebonne. On January 30, 2002, the jury returned a verdict of guilty on the responsive verdict of attempted manslaughter.[3]  On February 22, 2002, the trial court sentenced petitioner to a sentence of 12 years to be served at hard labor with credit for time served.[4]  On June 12, 2002, the trial court, pursuant to its finding that petitioner was a third-felony offender, vacated its earlier 12-year sentence and resentenced petitioner to a term of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.[5]

Pursuant to petitioner's out-of-time appeal, the Louisiana First Circuit Court of Appeal affirmed petitioner's conviction, habitual offender adjudication and sentence.  *State*

---

[1]A portion of the procedural history is taken from the Louisiana First Circuit Court of Appeal decision, *State v. Weston*, 912 So.2d 115 (Table), No. 2004-KA-2651 (La. App. 1 Cir. 2005) (unpublished opinion).  A copy of the Louisiana First Circuit's unpublished opinion is contained in the State rec., vol. 3 of 4, pp. 1044-1057.

[2]A copy of the pertinent bill of information is contained in the State rec., vol. 1 of 4.

[3]*See* State rec., vol. 1 of 4, p. 474.

[4]A copy of the February 22, 2002 sentencing transcript is contained in the State rec., vol. 2 of 4.

[5]A copy of the pertinent June 12, 2002 transcript is contained in the State rec., vol. 2 of 4.

*v. Weston*, 912 So.2d 115 (Table), No. 2004-KA-2651 (La. App. 1 Cir. 2005) (unpublished opinion).   On March 24, 2006, the Louisiana Supreme Court denied petitioner's writ application.  *State v. Weston*, 925 So.2d 1226 (La. 2006).

On or about October 26, 2006, petitioner filed with the state district court an application for post-conviction relief.[6]   Petitioner's effort in this regard culminated on January 8, 2010, when the Louisiana Supreme Court denied his writ application.  *State ex rel. Weston v. State*, 24 So.3d 865 (La. 2010).

On January 29, 2010, petitioner filed the instant action for federal habeas corpus relief,[7] raising the following claims: 1) The prosecutor made improper statements to the jury; 2) the State failed to prove intent; 3) he received ineffective assistance of counsel due to counsel's failure to request a mistrial, failure to request a jury instruction of justification, and failure to investigate and secure the testimony of an eyewitness; 4) the prosecutor failed to

---

[6]A copy of petitioner's post-conviction application is contained in the State rec., vol.  3 of 4.

[7]*See* Federal rec., doc. 3.  This January 29, 2010 filing date was ascertained via the court's use of the "mailbox rule."  Under this rule, a pleading filed by a prisoner acting *pro se* is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing, rather than the date it is received by the court.  *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  Generally, the date a prisoner signs his petition is presumed to be the date he or she delivered it to prison officials for mailing.  *See Colarte v. Leblanc*, 40 F.Supp.2d 816, 817 (E.D. La. 1999) (assumed that petitioner turned habeas corpus application over to prison officials for delivery to this court on the date application was signed); *Magee v. Cain*, 2000 WL 1023423, *4 n.2 (E.D. La. 2000) (inferred that filing date and signature date of habeas petition were the same); *Punch v. State*, 1999 WL 562729, *2 n.3 (E.D. La. 1999) (may reasonably be inferred that prisoner delivered habeas petition to prison officials for mailing on date petition was signed).

maintain his files in violation of state law; and, 5) Assistant District Attorney Ellen Daigle Doskey had a conflict of interest and, therefore, should not have represented the State in connection with a state evidentiary hearing.  The State, in its response (rec. doc. 9, p. 7), concedes, and a review of the record confirms, that the instant action is timely and that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).  Accordingly, this court shall review the pertinent facts and applicable standard of review, then proceed to address the merits of petitioner's claims.

## II.  FACTS[8]

On the evening of December 21, 2000, the petitioner, Wayne Douglas Weston, the victim, Eric Sanders, and Jacob Van Dyke were involved in a physical altercation on the porch of Gary and Odelia Voclain's trailer in Terrebonne Parish.  During the incident, the petitioner stabbed the victim several times, inflicting serious lacerations to the victim's head and neck, chest, and back.

On the day before the altercation the victim, who is Hispanic, and his African-American girlfriend, Stephanie Johnson, were visiting the Voclains at their trailer.  Following their departure, petitioner and another friend of the Voclains took the coffee cup used by the

---

[8]The facts are taken from the Louisiana First Circuit Court of Appeal decision, *State v. Weston*, 912 So. 2d 115 (Table), No. 2004-KA-2651 (La. App. 1 Cir. 2005) (unpublished opinion).

victim's girlfriend and threw it out of the trailer.  Because the victim's girlfriend had kissed the child before leaving, petitioner wiped Terry Voclain's (the one year-old son of Gary and Odelia Voclain) forehead with a towel and commented that the "n _ _ _ _ r" needed to be wiped off.  Petitioner also referred to the victim as a "wetback" and stated he was waiting for the victim to mess up so he could "fuck him up."  These statements and actions took place in the presence of Gary and Odelia Voclain, their daughter, Shantell Babin, and son-in-law, Perry Babin.

The next day the Babins told the victim about petitioner's actions and statements.  The victim became angry and wanted to confront the petitioner to determine what issue the petitioner had with him and hopefully receive an apology.  Because the victim had recently undergone neck surgery, he drove to the home of his nephew, Jacob Van Dyke, in Dulac, around 3 p.m., to have Van Dyke with him in the event the confrontation turned physical.

The victim and Van Dyke and the Babins spent part of the afternoon at the victim's residence.  Van Dyke and the victim drank beer, but all denied that they spent the entire time plotting to fight petitioner.  At approximately 8 p.m., the group drove to the Voclain trailer.  While they were at the trailer, petitioner arrived, but in an effort to ward off trouble, Odelia Voclain met him outside and they departed, returning to petitioner's trailer.  A short time later, a phone call was made from petitioner's trailer to the Voclain residence.  At some point, petitioner and the victim cursed and threatened each other, but eventually the victim

and his group agreed to leave the Voclain residence to avoid trouble.

As the group prepared to leave, Billy Zeringue, the 12-year old son of Odelia Voclain, got into the victim's car and refused to get out. A truce was reached when the victim agreed to take Billy to the store for a candy bar. When they returned a few minutes later to drop Billy off, petitioner's truck was at the Voclain trailer.

The victim and Van Dyke exited the car because the victim still wanted to speak with petitioner. As the victim approached the trailer, petitioner exited the trailer and threatened to kill the victim. Van Dyke, who was walking up the porch steps ahead of the victim, immediately threw a punch at petitioner as he approached and the fight ensued. Petitioner ultimately drew a knife and stabbed the victim three times. When the victim realized he was bleeding, he backed away, and petitioner returned to the Voclain trailer. Both Shantell and Perry Babin testified they observed petitioner wipe the knife, or whatever he held in his hand, on his leg, just above the knee. Neither of the Babins saw the victim or Van Dyke with any type of weapon.

Shortly thereafter, the police arrived in response to a neighbor's call to 911. A knife was recovered in a yard diagonal to the Voclain property. When questioned by Officer Roy Hughes of the Houma City Police, petitioner denied having a knife or having any knowledge of a knife. Petitioner never told Officer Hughes that he used a knife in self-defense or that he was in fear for his life. When questioned a second time at Chaubert Hospital by Detective

Kyle Faulk of the Houma City Police, petitioner maintained he had been in an altercation, but did not have a knife, nor could he explain how he had sustained a cut above his left knee. Petitioner never indicated to Detective Faulk that he used a knife in self-defense or that he was fearful for his life. Other than the cut to his leg, petitioner had no other visible signs of trauma.

Officer Hughes took a statement from the Babins; however, Van Dyke left before providing a statement out of fear that his involvement would create trouble for him. Gary and Odelia Voclain both told Officer Hughes that they were inside the trailer during the fight and did not see anything.

Dr. David Rau treated the victim for his wounds, which included a nine-centimeter laceration to the left side of his head and neck, a five-centimeter laceration to his back, and a five-centimeter laceration to the left side of his chest. According to Dr. Rau, who was accepted by the trial court as an expert surgeon, had any of these wounds been one-half inch to three quarters of an inch deeper, they could have been critical.

Odelia Voclain testified that when the victim brought Billy back from the store, the victim and Van Dyke got out of the car and were yelling at and threatening petitioner. According to Odelia Voclain, she left the trailer with petitioner and went out to the porch. Odelia Voclain testified that when Van Dyke swung at petitioner, Van Dyke hit her; yet, she denied having any bruises from the blow. Odelia Voclain also denied that she told Officer

Hughes that she was inside during the fight and did not see anything.

Petitioner testified on his own behalf.  He admitted to having prior convictions for negligent homicide, burglary, armed robbery, possession of an incendiary device, and simple battery.  Petitioner admitted to throwing out the coffee cup used by Stephanie Johnson and making the racial statements about the victim and Johnson the day before this altercation. Petitioner claimed he might have used this language to refer to the couple because the victim sold drugs and Johnson was a "crack head."  Petitioner also explained his statement that he was waiting to "fuck [the victim] up," was made because he claimed the victim was making advances towards Odelia Voclain.

According to petitioner, on the evening of December 21, he called over to the Voclain trailer to arrange to drop off bicycles he was storing for the Voclain children.  Odelia Voclain told him not to come over and explained that the victim and others were planning to fight him.  When petitioner heard this, he testified that he told Odelia Voclain that the situation had to stop and he would go over and apologize or do whatever it took to avoid trouble. Petitioner testified he drove over to the Voclain trailer, but Odelia Voclain met him on the porch, got in the truck, and told him they should go back to his residence, to which he agreed. About 15-20 minutes later, Gary Voclain arrived, and eventually a phone call was made to the Voclain trailer.  During this phone conversation, petitioner claimed he asked to speak to the victim, who cursed and threatened him; petitioner admitted to responding to the victim

in the same manner.

When Gary Voclain was satisfied that the victim and his friends would leave, he invited petitioner back to their trailer.  Petitioner followed the Voclains back to the trailer in his truck and went inside.  Soon after petitioner arrived, the victim pulled up.  According to petitioner, the victim and Van Dyke both exited the car and began threatening him.  Petitioner claimed Odelia Voclain left the trailer and told Van Dyke to leave several times before Van Dyke hit him and Odelia Voclain.  According to petitioner, a fight erupted at that point between him, Van Dyke, the victim, and Odelia Voclain.  At one point Odelia Voclain went back inside.  Petitioner testified that the victim and Van Dyke had him against the trailer and were beating him to the point he feared for his life, so he took out his knife and started swinging.  Only after the victim realized he was bleeding did they retreat, and petitioner went back inside.  Petitioner claimed he sustained his cut when one of the men grabbed his arm while he swung the knife.  Petitioner testified he gave the knife to Tony Billiot, who put the knife where it was recovered.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court

adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).   The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

10

28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV.  ANALYSIS

### A. Prosecutorial Misconduct

Petitioner contends that the prosecutor acted improperly "when he made improper statements, comments and gave his personal opinion before the jury concerning [p]etitioner and a defense witness."  (Rec. doc. 3, p. 6).  Petitioner points to various portions of the trial colloquy where, according to petitioner, the prosecutor improperly "made a racial issue out of the trial proceedings", suggested that the victim, Eric Sanders, and Jacob Van Dyke were heroes for beating petitioner up after his racial slurs rather than "cowardly" pulling a knife or gun on petitioner, and made derogatory remarks about defense witness, Odelia Voclain, suggesting that she was dull-witted, and about petitioner, suggesting that the money he offered to "buy off" Eric and Jacob by paying Eric's medical bills was obtained illegally. (Rec. doc. 3, pp. 7-14).

It is true that it is improper for a prosecutor to offer his or her opinion regarding matters outside of the evidence presented at trial.  However, a prosecutor is not prohibited from providing jurors with conclusions or inferences which he or she wishes the jury to draw from the evidence as long as those conclusions and/or inferences are grounded upon evidence.  *United States v. Munoz*, 150 F.3d 401, 414 (5th Cir. 1998), *cert. denied*, 525 U.S. 1112, 119 S.Ct. 887, 142 L.Ed.2d 786 (1999)  Such comments are not necessarily improper

if it is apparent to the jury that the views are based on the evidence presented at trial rather than on personal knowledge of facts outside the record.  *See, e.g., Nicolos v. Scott*, 69 F.3d 1255, 1282-1283 (5th Cir. 1995), *cert. denied*, 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996); *State v. Sawyer*, 350 So.2d 611, 614 (La. 1977).

In the instant matter, all of the comments about which petitioner complains are based upon evidence presented at trial rather than on any personal knowledge of facts outside the record.  Petitioner acknowledges that "on the stand [he] admitted" making racial slurs against the victim, Eric Sanders, and his girlfriend, Stephanie Johnson.  (Rec. doc. 3, p. 7).  Thus, the prosecutor's comments regarding those racial slurs and the inferences that he hoped jurors would draw from such slurs, such as the inference that Sanders and Van Dyke were heroes for not taking more violent action in reaction to petitioner's outrageous statements, were not impermissible.  Similarly, the prosecutor's comment regarding where petitioner got the money to offer to pay for Sanders' medical bills was arguably an inference counsel wished jurors to draw from the evidence that petitioner had committed illegal acts in the past, having admitted to having several prior convictions, including convictions for burglary and armed robbery.  Finally, counsel's suggestion that Odelia Voclain was not very bright, stating, "Have you always been this light in the head", was a comment based upon Voclain's admission to being a "pen-pal" to a man (petitioner) in prison and her negative response when questioned whether or not the man's criminal past made her nervous.  (Rec. doc. 3, p.

11).  Counsel's negative characterization of Voclain was, once again, an inference which he hoped jurors would draw based upon Voclain's admission that a man's criminal past would not prompt her to have any qualms about the man.  Accordingly, the court finds that the prosecutor's comments did not cross an impermissible line.

### B.  State Failed to Prove Intent

Petitioner argues that there was insufficient evidence to support his conviction on the charge of attempted manslaughter because the State failed to show the requisite intent because he acted in self-defense.

Petitioner raised this same claim in connection with his direct appeal.[9]  In addressing the instant claim, the Louisiana First Circuit Court of Appeal first examined applicable law as enunciated by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), along with applicable state law.

> The standard of review for the sufficiency of evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); La.C.Cr.P. art. 821.  This standard of review, in particular the requirement that the evidence be viewed in the light

---

[9]Petitioner reurged the instant claim in connection with his post-conviction application.  The state district court, however, citing La.C.Cr.P. art. 930.4(A), provided:  "Because this claim was fully litigated before both the First Circuit Court of Appeal and the Louisiana Supreme Court, this court will not consider the claim again."  *State v. Weston*, No. 361,457, Reasons for Post-Conviction Relief Order, p. 15.  A copy of the state district court's decision denying petitioner post-conviction relief is contained in the State rec., vol. 3 of 4, pp. 1090-1108.

most favorable to the prosecution, obliges the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. The reviewing court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. *State v. Corkern*, 2003-1393, pp. 2-3 (La. App. 1 Cir. 9/17/04), 897 So.2d 57, 59-60, *writ denied*, 2004-2627 (La. 2/18/05), 896 So.2d 29.

As the trier of fact, the jury is free to accept or reject, in whole or in part, the testimony of any witness. Furthermore, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Barnes*, 590 So.2d 1298, 1300 (La. App. 1 Cir. 1991).

> In a homicide case, the State must prove, beyond a reasonable doubt, that the homicide was not perpetuated in self-defense. However, Louisiana law is unclear as to who has the burden of proving self-defense in a non-homicide case, and what the burden is. In *State v. Freeman*, 427 So.2d 1161, 1162 (La. 1983), the Louisiana Supreme Court indicated, in dicta, that the defendant in a non-homicide case may have the burden of proving self-defense by a preponderance of the evidence, without resolving the issue. In previous cases dealing with this issue, this Court has analyzed the evidence under both standards. *See State v. Navarre*, 498 So.2d 249, 252-253 (La. App. 1 Cir. 1986); *State v. Aldridge*, 450 So.2d 1057, 1059-1060 (La. App. 1 Cir. 1984).

*State v. Barnes*, 590 So.2d at 1300-1301 (footnotes and citation omitted).

*Weston*, No. 2004-KA-2651, pp. 7-8.

Next, the Louisiana First Circuit examined the elements of manslaughter, along with the elements of specific intent.

Louisiana Revised Statute 14:30 provides:

A. Manslaughter is:

14

1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

2) a homicide committed, without any intent to cause death or great bodily harm.

a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or in any intentional misdemeanor directly affecting the person; or

b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1

Specific intent to commit a crime is an element of an attempted offense. La.R.S. 14:27(A). More specifically, specific intent to kill is an element of the crime of attempted manslaughter. Hence, a conviction for an attempted offense must rest upon sufficient proof that the offender actively desired to cause the prescribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose of and tending directly toward the accomplishing of his objective. La. R.S. 14:10 and 14:27; *State v. Dean*, 528 So.2d 679, 682 (La. App. 2 Cir. 1988).

Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. In reviewing the correctness of such [a] determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. *State v. Dean*, 528 So.2d at 682.

*Weston*, No. 2004-KA-2651, pp. 8-9.

Thereafter, the state appellate court reasoned:

> The excessiveness issue in this case is whether [petitioner] acted in self-defense. [Petitioner's] conviction for attempted manslaughter resulted solely from the jury's determination of the credibility of the witnesses; therefore, the matter is one of the weight of the evidence, not its sufficiency.
>
> At trial, it was revealed that Odelia Voclain had assisted [petitioner] in an attempt to get the present charge dismissed. Odelia Voclain admitted that she, [petitioner], and Gary Voclain had discussed paying the victim to drop the charges. Odelia Voclain had even approached the victim with [petitioner's] offer of money in exchange for dropping the charges. She also admitted they discussed the possibility of paying Shantell and Perry Babin to provide favorable testimony for [petitioner]. Odelia Voclain also testified under cross-examination that she had received letters from [petitioner] while he was incarcerated prior to trial that referenced their future together. Odelia Voclain admitted that she and her husband were having marital problems at this time. Finally, Odelia Voclain admitted under cross-examination that on the night of the altercation, she never heard the victim or Van Dyke actually say they were going to jump [petitioner], but that her children had said this to her.
>
> Gary Voclain also acknowledged that [petitioner] inquired about providing money for the victim to drop the charges, and that Shantell and Perry Babin were also supposed to get paid. Gary Voclain also testified that [petitioner] was drunk on the night of the altercation [and] that he invited [petitioner] back to his trailer to get him sobered up.
>
> [Petitioner] was also cross-examined about his attempt to pay the victim to drop the charges, but claimed it was Gary Voclain's idea. However, [petitioner] also testified he wanted to pay the victim to drop the charges because of his fear of returning to prison.
>
> Clearly, the revelation of the plot to pay the victim and provide Shantell and Perry Babin with money in exchange for their testimony destroyed the credibility of the defense witnesses. Moreover, [petitioner's] contention that he used the knife in self-defense was contrary to the initial statements he made to the police officers that there was no knife involved. Finally, [petitioner's] contention that he was against the trailer when he pulled the knife and started

swinging it was contradicted by the physical evidence that bloodstains from the significant wounds sustained by the victim were found only on the steps of the porch, not near the wall of the trailer.

The instant guilty verdict indicates that the jurors accepted the testimony of the State's witnesses and rejected the testimony of the defense witnesses. In reviewing the evidence in the light most favorable to the prosecution, there is a reasonable basis to find [petitioner] left the Voclain trailer while armed, threatened to kill the victim, and pulled a knife when Van Dyke hit him. Moreover, it is evident that [petitioner] could have avoided any confrontation by remaining in the trailer. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. *State v. Barnes*, 590 So.2d at 1301.

After a careful review of the record, we conclude that, viewing the evidence in the light most favorable to the prosecution, regardless of who had the burden of proof on the issue of self-defense, a rational trier of fact could have concluded that [petitioner] did not act in self-defense and that the state proved the offense of attempted manslaughter beyond a reasonable doubt. *See State v. Barnes*, 590 So.2d at 1301.

*Weston*, No. 2004-KA-2651, pp. 9-11.

This court finds that the above reasoning on the part of the Louisiana First Circuit does not represent an unreasonable application of the law enunciated in *Jackson* to the facts of this case. Accordingly, the instant claim for habeas corpus relief is without merit.

## C. Ineffective Assistance of Counsel

Petitioner argues that counsel was ineffective for failing to request a mistrial in response to the prosecution's frequent references to race, specifically, his frequent references to petitioner's racial slurs against the victim and his girlfriend. Petitioner also argues that counsel was ineffective due to his failure to request a jury instruction of justification and

failure to investigate and secure the testimony of an eyewitness to the incident.

Petitioner raised these same claims in connection with his state post-conviction application.  In addressing said claims, the state district court first set forth the applicable law.

> Claims of ineffective assistance of counsel are reviewed under the two-part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In order to prevail, [petitioner] must show both that (1) counsel's performance was deficient and (2) he was prejudiced by the deficiency.  With regard to the second element, i.e., prejudice, [petitioner] must show that any error was so serious as to deprive him of a fair trial.  To carry this burden, [petitioner] must show that there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.  If [petitioner] makes an inadequate showing on either one of the components required by *Strickland*, i.e., deficient performance or prejudice, the reviewing court need not address the other component.  If the alleged error falls within the ambit of trial strategy, it does not establish ineffective assistance of counsel.  Moreover, hindsight is not the proper prospective for judging the competence of counsel's decisions because opinions may differ as to the advisability of a tactic; and, an attorney's level of representation may not be determined by whether a particular strategy is successful.

*State v. Weston*, No. 361,457, Reasons for Post-Conviction Relief Order, pp. 15-16 (footnotes omitted).

Regarding petitioner's complaint over counsel's failure to request a mistrial in light of the prosecutor's frequent references to petitioner's racial slurs, as this court noted, in addressing petitioner's prosecutorial misconduct claim, counsel's comments in this regard were not objectionable and were not a basis for a mistrial.  Rather, said comments were

18

merely counsel's inferences and/or conclusions based upon evidence presented at trial, petitioner having admitted to making racial slurs against the victim and his girlfriend.[10] Similarly, in rejecting the instant claim, the state district court noted:  "As these statements were either statements of fact or a belief based on the facts, defense counsel was not ineffective for failing to object or failing to request a mistrial."  *Weston*, No. 361,457, Reasons for Post-Conviction Relief Order, p. 17.  Accordingly, the instant claim is without merit.

Next, petitioner argues that counsel was ineffective due to his failure to request a jury instruction of justification.  Petitioner states that if the jury had been provided with such an instruction, they would have been aware that a verdict exonerating him was warranted if they believed that he "acted under duress of circumstances" in order to protect his life.  (Rec. doc. 3, p. 29).

As the state district court noted in rejecting petitioner's claim, the "trial court did, in fact, instruct the jury as to the issue of justification."  *Weston*, No. 361,457, Reasons for Post-Conviction Relief Order, p. 17 (footnote omitted).  A review of the trial transcript reflects that jurors were instructed:

> The use of force or violence upon the person of another is justifiable for the purpose of preventing a forcible offense against one's own person if the force used is reasonable and apparently necessary to prevent the offense.

---

[10]*See* discussion *supra* at p. 12.

> Thus, if you find:
>
> 1.  That the defendant committed the offense charged for the purpose of preventing a forcible offense against his person; and
>
> 2.  That the amount of force or violence used was reasonable; and
>
> 3.  That the force or violence used was apparently necessary to prevent the forcible offense;
>
> Then you must find the defendant not guilty.

(State rec., vol. 1 of 4, pp. 456-457).

Because the trial court did provide jurors with a justification instruction, clearly defense counsel was not deficient in not requesting such an instruction. Accordingly, the instant claim is without merit.

Lastly, petitioner claims that counsel was ineffective due to his failure to investigate and secure the testimony of Billy Zeringue, an eyewitness to the incident. Petitioner contends that "Billy's testimony would have changed the outcome of the verdict" as it would have shown that the victim, Eric Sanders, had a gun in his car when he arrived at the Voclain trailer and, as such, had the intent to inflict serious harm upon petitioner. (Rec. doc. 3, p. 35).[11]

---

[11]In connection with the instant claim, petitioner also appears to claim that the prosecution acted unlawfully in connection with their pre-trial investigation by questioning Billy Zeringue, who was a minor at the time, without his mother's permission and without counsel being present. However, in addressing said claim, the state district court observed that Zeringue was not the accused, but merely an eyewitness. As such, no "*Miranda* rights were triggered" and Zeringue's interview "did not constitute [a] custodial interrogation." *Weston*, No. 361,457, Reasons for Post-Conviction Relief, p. 18. Accordingly, the court concluded that "the detective's interview of Billy Zeringue was not improper...." *Id.* This court agrees with the above conclusion.

As noted earlier, petitioner raised this same claim on post-conviction.  In light of the above allegation, the state district court, on May 29, 2008, conducted an evidentiary hearing wherein petitioner was represented by counsel, Daniel Becnel, III.[12]  At this hearing,  Billy Zeringue testified that when he was in the car with "Rick" (the victim), returning to the Voclain trailer after going to the grocery store, "Rick was talking about [how] he was going to kill Wayne [the petitioner] and he had a gun."  (State rec., vol. 3 of 4, p. 929).  Zeringue stated that once they arrived at the Voclain trailer, Jacob Van Dyke started the altercation by throwing a punch at petitioner, but hitting Zeringue's mother, Odelia Voclain, instead.  (State rec., vol. 3 of 4, p. 931).  Zeringue testified that after Van Dyke threw the first punch, "Rick ran up to Mr. Wayne and started punching him".  (State rec., vol. 3 of 4, p. 931).  Thereafter, Zeringue heard Rick complain that petitioner had "cut" him.  (State rec., vol. 3 of 4, p. 931).

After listening to the evidentiary hearing testimony,[13] the state district court first reiterated the standard of review imposed under *Strickland v. Washington.*  (State rec., vol. 3 of 4, pp. 955-957).  Thereafter, the court concluded that Billy Zeringue's testimony "adds nothing to the case."[14]  The court elaborated:

---

[12]A copy of the transcript of petitioner's May 29, 2008 evidentiary hearing is contained in the State rec., vol. 3 of 4, pp. 922-958.

[13]In addition to Billy Zeringue, John Gaines, the principal of the school which Billy Zeringue attended at the time of this incident, and Odelia Voclain testified briefly at the May 29, 2008 evidentiary hearing.

[14]State rec., vol. 3 of 4, p. 957.

Everything that Mr. Zeringue said came out in the case. Why Mr. Daigle [defense counsel] didn't call Mr. Zeringue - - He apparently knew about him. He just didn't feel that it would help his case in any way.[15] There's no additional testimony.

The question was self-defense and I think that was brought up and the instruction was given to the jury, the defense was presented. The case - - The Court, apparently - - Based on the question that they had with the self-defense, the jury came back from the attempted second degree murder with attempted manslaughter.

This Court in no way can find that the jury was wrong in making that [decision] and the Court will deny the post-conviction relief on the basis that Mr. Zeringue's testimony would not have made a difference and there was no ineffective assistance of counsel.

(State rec., vol. 3 of 4, pp. 957-958).

A review of the trial transcript reveals that Odelia Voclain testified, as Zeringue testified, that Jacob Van Dyke started the fight and, shortly thereafter, petitioner entered the fray.

Jacob went to swing at Wayne. And he hit me. And then I moved. And they threw a couple of licks. And then that's when I remember Rick coming.... I want to say they [Rick and Wayne] threw a couple of licks....

(State rec., vol. 1 of 4, p. 352).

Thus, as the state district court concluded, the evidence that petitioner acted in self-defense, that he pulled a knife and stabbed the victim in response to the victim's physical

---

[15]Mr. Daigle could not offer testimony as to why he did not call Billy Zeringue as a witness because he died prior to the May 29, 2008 evidentiary hearing.

assault upon him, was clearly brought before the jury.  Further, as the state district court

noted, a self-defense instruction was given to the jury.  A review of the trial transcript reflects

that jurors were instructed that the State had the burden of proving that the offense was not

committed in self-defense and that a claim of self-defense should not be rejected absent a

finding that "the defendant was the aggressor or that he brought on the difficulty".[16]

Based upon the above, this court finds that the state district court's conclusion, that

"Mr. Zeringue's testimony would not have made a difference and there was no ineffective

assistance of counsel", does not represent an unreasonable application of *Strickland* to the

facts of this case.  While Zeringue stated that the victim had a gun, it is undisputed that the

victim made no effort to use this alleged gun in his altercation with petitioner.  Odelia

---

[16]Specifically, the trial court instructed:

> The defendant who raises the defense that he acted in self-defense does not have the burden of proof on that issue.  The State has the burden of proving beyond a reasonable doubt that the offense was not committed in self-defense.
>
> The person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
>
> Thus, if you find that the defendant was the aggressor or that he brought on the difficulty, you must reject his claim of self-defense unless you find:
>
> 1.  That he withdrew from the conflict; and
> 2.  That [h]is withdrawal was in good faith; and
> 3.  That he withdrew in a manner that put his adversary on notice that he wished to withdraw and discontinue the conflict.

(State rec., vol. 1 of 4, pp. 457-458).

Voclain, along with Billy Zeringue, stated that the victim only threw punches at petitioner. In response, petitioner drew a knife and stabbed the victim three times. This sequence of events, undisputed by Billy Zeringue, was presented to the jury and based upon this evidence, the jury returned a verdict of attempted manslaughter. It is not reasonably probable that Zeringue's testimony would have altered this outcome.

### D. Prosecutor Failed to Maintain Files

Petitioner asserts that the district attorney's office, in violation of state law, failed to properly maintain its files. As a result, the district attorney's office was unable to comply with the state district court's order, pursuant to petitioner's motion, that petitioner be provided with a copy of its file regarding petitioner's prosecution.

When the district attorney's office failed to provide petitioner with a copy of the requested file, the state district court, on February 6, 2007, conducted a hearing, wherein petitioner was represented by counsel, Daniel Becnel, III, regarding the district attorney's failure to produce petitioner's file.[17]   At this hearing, Assistant District Attorney Jane Williams represented to the court that despite numerous searches, she had been unable to located petitioner's file and it was her understanding that the file had been destroyed in 2003 when a portion of the ceiling in the district attorney's file storage facility collapsed. (State

---

[17]A copy of the transcript of petitioner's February 6, 2007 hearing is contained in the State rec., vol. 3 of 4, pp. 1112-1117.

rec., vol. 3 of 4, p. 1115).  It was Ms. Williams' suggestion that Mr. Becnel obtain the desired

information from the Terrebonne Parish Sheriff's Office, explaining that "99 times out of

100" the district attorney's file "consists solely of information that's obtained from the

investigating agency...."  (State rec., vol. 3 of 4, pp.  1116-1117).  At that point, it was

discussed how Mr. Becnel would proceed to obtain the record from the sheriff's office and

no further objection was lodged regarding the district attorney's failure to produce its file.

(State rec., vol. 3 of 4, p. 1117).

It is well established that federal habeas review is limited to questions of constitutional

dimension.  *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert.*

*denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d

218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788

(1998).  The fact that state law may have been violated by virtue of the fact that the district

attorney's office failed to properly maintain its file regarding petitioner's prosecution is of

no moment for purposes of attaining federal habeas corpus relief absent a due process

violation.

Petitioner has set forth no due process violation resulting from the district attorney's

loss of his file.  The only information or documentation which petitioner complains he did

not receive were "the reports from the Investigators when they went to visit Billy Zeringue

at his school."  (Rec. doc. 3, p. 37).  However, petitioner was not prejudiced by this lack of

information since, as set forth above, an evidentiary hearing was held in this matter pursuant to which Billy Zeringue testified with regard to what he witnessed on the date of the incident and, therefore, informed what he would have told investigators when they visited him at school.

### E.  Conflict of Interest

Finally, petitioner "lodges a complaint of conflict of interest against Ellen Daigle Doskey".  (Rec. doc. 3, p. 38).  Ms. Daigle Doskey represented the State in connection with petitioner's May 29, 2008 state court evidentiary hearing wherein the issue to be resolved was whether trial counsel, Warren Daigle, was ineffective due to his failure to call Billy Zeringue as a witness at trial.  Petitioner contends that Ms. Daigle Doskey is "directly related" to Warren Daigle.  (Rec. doc. 3, p. 38).  As such, petitioner argues that Ms. Daigle Doskey, at the May 29, 2008 hearing, was improperly representing the State as well as her "family interest".  (Rec. doc. 3, p. 39).

It is doubtful whether the above-described "conflict of interest" would constitute grounds for habeas corpus relief.  However, this court need not resolve this issue since no such conflict exists.  Ms. Daigle Doskey, who prepared the State's response to petitioner's habeas application, "swear[s] that she is not related to the former defense counsel even though they share the same name of "Daigle".  (Rec. doc. 9, p. 8) (footnote omitted).

## RECOMMENDATION

It is therefore **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Wayne Weston, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. §636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[18]

New Orleans, Louisiana, this __14th__ day of _____January_____, 2011.


_____
LOUIS MOORE, JR.

United States Magistrate Judge

---

[18]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

27